TOKIOKA SMITH
A Limited Liability Law Company

JESSE J. T. SMITH              9403
JAIME H. TOKIOKA           10819
Seven Waterfront Plaza, Suite 409
500 Ala Moana Boulevard
Honolulu, Hawaii  96813
Telephone No.  (808) 983-1685
jsmith@localhawaiicounsel.com
jtokioka@localhawaiicounsel.com

Attorney for Plaintiff
STEVEN VAN NESS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| STEVEN VAN NESS, | ) | Civil No. 1:23-cv-00632 |
| --- | --- | --- |
| | ) | (Breach of Contract) |
| Plaintiff, | ) | |
| | ) | COMPLAINT; DEMAND FOR |
| vs. | ) | JURY TRIAL;  SUMMONS |
| | ) | |
| JARED OLIN; RICHARD ALTIG; RED SERVICES, LLC; ALOHA ALARM & SAFETY, LLC; JOHN DOES 1-20; JANE DOES 1-20; DOE CORPORATIONS 1-20; DOE GOVERNMENTAL AGENCIES 1-20; and DOE ENTITIES 1-20, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

# COMPLAINT

COMES NOW Plaintiff STEVEN VAN NESS, by and through his attorneys, Tokioka Smith, a Limited Liability Law Company, and for his Complaint against Defendants JARED OLIN; RICHARD ALTIG; RED SERVICES, LLC; ALOHA ALARM & SAFETY, LLC; JOHN DOES 1-20; JANE DOES 1-20; DOE CORPORATIONS 1-20; DOE GOVERNMENTAL AGENCIES 1-20; and DOE ENTITIES 1-20, and hereby alleges and avers as follows:

## PARTIES

1. Plaintiff STEVEN VAN NESS ("Plaintiff" or "Van Ness") is, and at all times relevant was, a resident of the State of Hawaii, residing at 28-1203 Old Mamalahoa Hwy., Pepeekeo, HI 96783. Van Ness has been involved in the alarm business throughout the State of Hawaii for over twenty years.

2. Upon information and belief, Defendant JARED OLIN ("Defendant Olin"), is, and at all times relevant was, a resident of the State of Washington, who sought to do business with Van Ness in the alarm business.

3. Upon information and belief, Defendant RICHARD ALTIG ("Defendant Altig"), is, and at all times relevant was, a resident of the State of Washington, who sought to do business with Van Ness in the alarm business.

4. Upon information and belief, Defendant RED SERVICES, LLC ("RED") is, and at all times relevant was, a foreign limited liability company operated by Defendants with its principal place of business in the State of Washington.

5. Upon information and belief, Defendant ALOHA ALARM & SAFETY, LLC ("Aloha Alarm"),[1] is, and at all times relevant was, a foreign limited liability company with its principal place of business in the State of Washington.

6. Defendants John Does 1-20; Jane Does 1-20; Doe Corporations 1-20; Doe Governmental Agencies 1-20; and Doe Entities 1-20 are fictitiously-named persons or entities whose identities, capacities or involvement in the subject matter of this case are presently unknown but who are believed to be responsible in some manner for the claims asserted by Plaintiff herein as additional transferees, agents, owners, assignees, delegates, successors, employees, shareholders, affiliates, subsidiaries, alter egos, partners, co-participants, or other representatives of the named Defendants or otherwise stand in such relationship with Defendants, or participated in such conduct therewith as to be liable to Plaintiff for the claims asserted herein.  Plaintiff has conducted a diligent inquiry as to the identities,

---

[1] (Defendant Olin, Defendant Altig, RED, and Aloha Alarm are collectively referred to herein as "Defendants")

3

capacities and involvement of the Doe Defendants fictitiously named in this paragraph but is unable at this time to ascertain such matters with the requisite certainty to name them in this Complaint.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), in that this is a civil action between Plaintiff, who is a citizen of the State of Hawaii, and Defendants, who are citizens of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and/or in that the property that is the subject of this action is situated in this judicial district.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(1), in that Plaintiff resides in this judicial district.

## FACTS COMMON TO ALL COUNTS

9.     Van Ness has been working in the alarm and security services industry for nearly thirty years, over which time he has established himself as one of the top alarm and security services professionals in Hawaii.

10.     Van Ness founded ADVANCED PROTECTION NETWORK, INC. ("APN") in or about the early 1990s in order to provide alarm monitoring and

security systems to residents and business across the State of Hawaii, including alarm installation, maintenance, and repair.

11. APN, at all times relevant, was an alarm security company formed pursuant to the laws of the State of Hawaii and has been doing business in this judicial district for over twenty years.

12. Through decades of hard work and dedication, Van Ness turned APN into one of the premier alarm security companies in the entire state.

13. Over the years, APN employed Van Ness, along with some of his close friends/business partners and family members, in sales, operations, and other sectors that were essential to APN's success.

14. Sometime in the latter part of 2019, Defendants approached Van Ness about acquiring 100% of the shares of APN and approximately 1,413 existing subscriber accounts that APN owned as part of its business of installing, servicing, and monitoring of alarm systems.

## Defendants acquire APN from Van Ness

15. After agreeing on the essential terms, Defendants retained an attorney licensed in the State of Washington, who prepared and presented to Van Ness that certain Share Purchase Agreement ("Share PSA") and that certain Subscriber Purchase Agreement ("Subscriber PSA"), both dated on or about December 31,

2019, to effectuate the agreed upon terms of the acquisition of APN and its subscriber accounts by Defendants.

16. Under the Share PSA, Van Ness transferred 100% of the shares of APN to Defendant RED, a foreign limited liability company, owned and operated by Defendant Olin and Defendant Altig in the State of Washington in exchange for the payment of TEN THOUSAND DOLLARS AND NO CENTS ($10,000.00).

17. Thereafter, as part of the same transaction, Defendants acquired from APN approximately 1,413 subscriber accounts (referred to herein as "Subscriber Accounts" or "Subscribers") for the total purchase price of FOUR MILLION THREE HUNDRED NINETY-SIX THOUSAND NINETY-ONE 90/100 DOLLARS **($4,396,091.90)** per the Subscriber PSA.

18. The Subscriber PSA defines Subscribers as those accounts where APN had a written contract in place for the leasing, servicing, or monitoring of alarm systems (as opposed to camera only installations without a monitoring component).

19. As consideration for these Subscriber Accounts, the Subscriber PSA required Defendants to adhere to the following payment schedule:

    i.    An initial payment of Five Hundred Thousand Dollars ($500,000 USD) at closing to Steve Van Ness;
    ii.   Five Thousand Dollars ($5,000 USD) previously paid to Steve Van Ness as consideration for execution of the Letter of Intent entered into December 26, 2019;

  iii. Ten Thousand Dollars ($10,000 USD) paid as consideration for a Membership Interest Purchase Agreement between Red Services, LLC and Steve Van Ness, and paid to Steve Van Ness.

  iv. The remaining Three Million Eight Hundred Ninety-Six Thousand, and Ninety-One Dollars and Ninety cents ($3,896,091.90 USD) shall be paid in monthly payments to Steve Van Ness, commencing February 20, 2020, and continuing on a monthly basis on the 20th of each month thereafter until the amount is paid in full. Each monthly payment shall be equal to ninety percent (90%) of the previous month's collected revenue from the purchased subscriber accounts, from those amounts collected from the 1st to last days of the prior month (i.e. – January 1 through January 31; February 1 through February 28; etc.). The Parties estimate approximately forty-five (45) such payments, but payments shall continue until the amount is paid in full.

20. Moreover, as security for the above payment obligations, Defendants provided a Promissory Note in favor of Van Ness (the "Note"), which is attached as an exhibit to the Share PSA.

21. Upon information and belief, Defendant Olin executed all documents pertinent to the acquisition of APN by Defendants, as the controlling partners of Defendants RED / Aloha Alarm, including the Share PSA, the Subscriber PSA, and the Note.

22. Upon information and belief, Defendant Altig executed all documents pertinent to the acquisition of APN by Defendants, as the controlling partners of Defendants RED / Aloha Alarm, including the Share PSA, the Subscriber PSA, and the Note.

## Defendants' Gross Mismanagement of APN from the Beginning

23. Up until the time of the sale of APN and transfer of operations from Van Ness to Defendants in or about December 2019/January 2020, APN was a family owned, well-run and managed company with around 25 years of goodwill built up in the security and alarm service industry in Hawaii.

24. Following execution of the APN acquisition documents, on or about December 31, 2020, APN retained Van Ness, as an independent contractor, to act as a consultant and sales representative, pursuant to that certain Independent Contractor Agreement between Van Ness and APN, executed on or about January 13, 2020 ("IC Agreement"), which was also prepared by Defendants' attorney in Washington.

25. As an inducement for Van Ness to act as an Independent Contractor for APN, Defendants promised not only to pay Van Ness a fully vested commission of 50% of profits from any new sales as reflected in the IC Agreement but also made this same promise regarding Van Ness' family members and close business associates involved with APN at the time, which they promptly violated.

26. Moreover, despite promises that APN's current staff would continue to be employed, as either employees or independent contractors, while Defendants attempted to run the business from Washington State, most were fired within the first few months while the rest were let go over the next two years, including all

staff answering the phones, handling service calls, running and performing services at customer locations, collections, managers, as well as inventory and equipment staff.

27. Thereafter, at Defendants' direction, all APN staff were contracted out, and off-site operators on the mainland were assigned to deal with the enormous volume of customer phone calls. Unsurprisingly, this led to customers calling into the company line being placed on lengthy holds before being cut off or told to leave a message, although nobody would call them back for more than a week. Additionally, salespersons could not get through to APN call staff to schedule routine installations and maintenance appointments.

28. As a result of this poor customer service, which was far below the excellent standards that Van Ness had established for APN over more than two decades, customers started contacting Van Ness directly to lodge complaints, and despite his best efforts, began leaving APN in droves.

29. To make matters worse, Defendants refused to pay APN's sales staff their contractually obligated commissions, causing APN to also lose the sales staff needed to maintain and grow APN's customer base; Defendants were well-aware of this situation but never did anything to address it.

30. Thus, due to Defendants' gross mismanagement of APN following their acquisition of all of APN's shares and Subscriber Accounts – which included

not only the serious service issues discussed above but also a scheme to overbill existing Subscribers – displeased APN customers began leaving in droves.

31. Van Ness did his best to continue to service APN's existing Subscriber Accounts and maintain APN's relationships with existing employees/service providers under the terrible circumstances created by Defendants' gross mismanagement.

32. Despite his efforts, however, APN customers were extremely frustrated *or worse* and APN staff were either fired or deprived of their commissions, leaving on their own accord with no inducement by Van Ness, who has never purposefully interfered with any relationship, advantage or expectancy between APN and any other person or entity, including any current Subscribers and/or potential customers.

33. Meanwhile, Defendants incredibly continued to falsely advertise APN as a family run and military owned local business in its marketing, even continuing to display a photograph of Van Ness as well as his artificial intelligence ("AI") generated likeness on the APN website, thereby tarnishing Van Ness' hard-earned reputation in the local alarm industry.

### Defendants' Termination Letter / Van Ness' Notice of Default

34. Now, Defendants are attempting to shirk their obligation to pay to Van Ness the full agreed-upon purchase price for the Subscriber Accounts received

under the Subscriber PSA, based on false and pretextual allegations regarding purported violations of the non-solicitation/non-compete provisions contained in the IC Agreement and related agreements.

35. Pursuant to this strategy, Defendants sent to Van Ness a letter ("Termination Letter") dated May 22, 2023, which purported to terminate the Subscriber PSA and the IC Agreement while disavowing any further obligations to pay the more than two million dollars outstanding under the Note.

36. Citing the non-compete provisions contained therein, including Section 7 of the Subscriber PSA prohibiting Van Ness from engaging "in the **alarm business** in the States of Washington or Hawaii as owner, employee, consultant or any capacity whatsoever . . . for a period of [three] (3) years after closing of this transaction," Defendants claimed without evidence that Van Ness engaged "in activities in direct competition with APN by soliciting current and potential future subscribers and employees of APN."  (Emphasis in **bold** added).

37. As illuminated above, however, any loss of business/impairment to APN and/or relationships with current and/or potential customers of APN is the direct result of Defendants' mismanagement of APN and subsequent failure to provide satisfactory service to existing customers and to follow up with potential customers.

38. Indeed, Van Ness has never competed with APN in the alarm business in the States of Washington or Hawaii in violation of the IC Agreement or any other agreement as alleged in the Termination Letter.

39. Therefore, on or about June 15, 2023, Van Ness responded to Defendants' Termination Letter by not only refuting the many unfounded and baseless allegations contained therein but also declaring a default under Paragraph 5 of the Note for among other things "a. Failure to Pay."

40. To date, Defendants have paid Van Ness approximately only $2,314,977.78 leaving a remaining outstanding balance under the Note of **$2,081,114.12**, which amount Defendants have admitted to in prior correspondence, including the Termination Letter.

### COUNT I: BREACH OF CONTRACT (SUBSCRIBER PSA) / ENFORCEMENT OF PROMISSORY NOTE

41. Plaintiff realleges and incorporates herein by reference the allegations of paragraphs 1 through 40 of the Complaint.

42. To prevail on a breach of contract claim, Van Ness must prove the following elements: (1) the existence of the contract; (2) Plaintiff's performance thereunder; (3) Defendants' failure to perform an obligation under the contract; and (4) Defendants' failure to perform was a legal cause of damage to Van Ness.

43. The Subscriber PSA, including the Note, which provides that: "Payments will be made in full each month, for each month that APN's team

produces gross profit equal to or above agreed upon expenses" until the entire balance has been paid in full," constitutes a legally enforceable and binding contract.

44. Van Ness has performed all of his obligations under the Subscriber PSA.

45. By refusing to timely pay the amounts due and owing pursuant to the payment schedule for the Subscriber Accounts contained in the Subscriber PSA, as secured by the Note, including failing to make any payments following the Termination Letter on May 22, 2023, Defendants have breached their contractual obligations to Van Ness.

46. The Subscriber PSA provides Defendants with the "[a]bility to return client accounts in lieu of a portion of indebtedness after notice of default, in satisfaction of the remainder of the note, utilizing a multitier of thirty-six (36) times Recurring Monthly Revenue [("RMR")] of said accounts in valuation of satisfaction."

47. Following receipt of Van Ness' notice of default letter, however, Defendants neither made any more payments toward the amounts outstanding nor offered to return any of the Subscribers as authorized under the contract.

48. Unlike the IC Agreement, which includes a mandatory arbitration provision as to any and all disputes thereunder, the Note provides for enforcement

13

in the "courts of the State of Hawaii or of the United States of America for the District of Hawaii."

49.     The Note additionally entitles Van Ness to recover the full principal amount due under the Note and interest at the Default rate of twenty-four percent (24%) per annum as well as his attorneys' fees and costs.

50.     Accordingly, Van Ness is entitled to entry of judgment herein for the full amount owing under the Subscriber PSA/ Note with per diem interest at the default rate from May 22, 2023), plus his reasonable attorneys' fees and costs.

**COUNT II: QUASI CONTRACT / UNJUST ENRICHMENT**

51.     Plaintiff realleges and incorporates herein by reference the allegations of paragraphs 1 through 50 of the Complaint.

52.     The elements of a quasi-contract / unjust enrichment claim are: (1) Plaintiff has conferred a benefit upon Defendant, and (2) retention of that benefit would be unjust.

53.     Van Ness conferred a benefit to Defendants when he transferred all of the shares of APN and Subscriber Accounts to them pursuant to the Subscriber PSA and Share PSA.

54.     Although Van Ness maintains that he has fully performed under the Subscriber PSA and has not violated any of the non-competition provisions

provided therein, or any other agreement, it would be unjust to allow Defendants to retain this benefit as threatened in the Termination Letter.

55. Accordingly, Van Ness prays that the Court use its equitable powers and either award him the full value of the Subscriber Accounts or return those Subscribers to Van Ness pursuant to the methods established in the Subscriber PSA for RMR in accordance with the evidence adduced herein.

### COUNT III: DECLARATORY / INJUNCTIVE RELIEF

56. Plaintiff realleges and incorporates herein by reference the allegations of paragraphs 1 through 55 of the Complaint.

57. As a result of the above-described events and circumstances, there is an actual and continuing controversy regarding Van Ness' entitlement to and Defendants' refusal to pay the full amounts owing under the Subscriber PSA, as secured by the Note.

58. The issuance of a declaratory judgment regarding Van Ness right to full payment under the Subscriber PSA, as secured by the Note, in law or in equity, will terminate this controversy.

59. Accordingly, Plaintiff prays for a binding declaration that he is owed and entitled to the immediate payment of **$2,081,114.12**, which represents the amount outstanding under the Subscriber PSA/Note for Defendants' acquisition of

the Subscribers as of May 22, 2023, plus interest at the default rate from that time per the terms of the contract.

60. Furthermore, Plaintiff prays that the Court will enjoin Defendants from any further transfer of the assets and/or shares of APN, as described herein, until they have fully satisfied this payment obligation to Van Ness pursuant to the terms of the Subscriber PSA, as secured by the Note.

### COUNT IV: DEFAMATION (FALSE LIGHT)

61. Plaintiff realleges and incorporates herein by reference the allegations of paragraphs 1 through 60 of the Complaint.

62. At all times material to the Complaint, Defendants owed a legal duty not to generate and/or promote false and defamatory statements about Van Ness and/or his business practices to the public and/or any third-parties.

63. Although Van Ness has at all times operated in good faith in accordance with his contractual obligations, Defendants have acted in bad faith, including by falsely reporting profits, as well as the gross mismanagement of APN and significant servicing issues highlighted above.

64. Meanwhile, Defendants continue to falsely advertise APN as a family run and military owned local business, even continuing to display Van Ness' likeness on the APN website and marketing materials, thereby tarnishing Van

Ness' hard-earned reputation in the alarm services and security industry in the State of Hawaii.

65. Upon information and belief, Defendants breached their duty of care to Van Ness when they acted with actual malice and/or were grossly negligent in publishing these false and defamatory statements on their website and marketing materials, not to mention in their conversations with third-parties in the absence of any applicable privilege or right to do so.

66. As a direct and proximate result of Defendants publishing such false and defamatory materials, Van Ness' reputation in the alarm services and security industry has been harmed to the tune of several million dollars in lost customers and severely diminished prospective business advantage.

67. As such, Plaintiff has sustained general, special, and punitive damages in such amounts to be proven at trial.

### COUNT V: TORTIOUS INTERFERENCE
### (PROSPECTIVE BUSINESS ADVANTAGE)

68. Plaintiff realleges and incorporates herein by reference the allegations of paragraphs 1 through 67 of the Complaint.

69. The elements of tortious interference with prospective business/economic advantage are: (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it

maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

70. As will be proven herein, Van Ness had very valuable business relationships with customers and other professionals in the alarm and security industry which Defendants had knowledge of.

71. Despite that these business relationships were likely to mature into a significant future prospective advantage over the remaining duration of Van Ness' career, Defendants purposefully interfered with these relationships and Van Ness' prospective business advantage.

72. As such, Plaintiff has sustained general, special, and punitive damages in such amounts to be proven at trial.

WHEREFORE, Plaintiff prays that the Court:

    A.    Accept jurisdiction over this matter;

    B.    Declare that Van Ness is owed and entitled to the immediate payment of **$2,081,114.12**, which represents the amount outstanding under the Subscriber PSA, as secured by the Note, for Defendants' acquisition of the

Subscribers as of May 22, 2023, plus interest at the default rate per the terms of the Note, and enter judgment in Van Ness' favor in this amount;

      C.     Order an accounting of all revenues received by APN from January 1, 2020 until the present;

      D.     Impose a constructive trust on all assets of APN, including any and all remaining Subscriber Accounts, in order to satisfy Defendants' obligations under the Subscriber PSA / Note;

      E.     Issue an injunction forbidding any further transfer of the assets and/or shares of APN;

      F.     Award Plaintiff general, special, and punitive damages commensurate with the proof at trial;

      G.     Award Plaintiff such other and further relief as may be just and proper, including, but not limited to, pre-judgment interest, garnishment, and attachment; and

      H.     Enter Final Judgment in Plaintiff's favor on all claims asserted herein and award Plaintiff his reasonable attorneys' fees and costs.

DATED: Honolulu, Hawai'i, December 29, 2023.

                                              */s/ Jesse J. T. Smith*
                                              JESSE J. T. SMITH
                                              JAIME H. TOKIOKA
                                              Attorneys for Plaintiff
                                              STEVE VAN NESS

STATE OF HAWAII

| | |
|---|---|
| STEVEN VAN NESS | ) Civil No. 1:23-cv-00632 |
| | ) (Breach of Contract) |
| Plaintiff, | ) |
| | ) DEMAND FOR JURY TRIAL |
| vs. | ) |
| | ) |
| JARED OLIN; RICHARD ALTIG; RED SERVICES, LLC; ALOHA ALARM & SAFETY, LLC; JOHN DOES 1-20; JANE DOES 1-20; DOE CORPORATIONS 1-20; DOE GOVERNMENTAL AGENCIES 1-20; and DOE ENTITIES 1-20, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEMAND FOR JURY TRIAL

Plaintiff STEVEN VAN NESS, by and through his attorneys, Tokioka Smith, A Limited Liability Law Company, hereby demands trial by jury on all issues triable with respect to Count IV (Defamation) and Count V (Tortious Interference) of the Complaint.

DATED:  Honolulu, Hawai'i, December 29, 2023.

*/s/ Jesse J. T. Smith*
JESSE J. T. SMITH
JAIME H. TOKIOKA

Attorneys for Plaintiff
STEVE VAN NESS